UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| BRANDON CARLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-cv-04227-SLD-JEH |
| | ) | |
| SEXTON FORD SALES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

Before the Court are Defendant Sexton Ford Sales, Inc.'s ("Sexton") motion for summary

judgment, ECF No. 17, and Plaintiff Brandon Carlson's motion for leave to file an overlength

response to that motion, ECF No. 20.  For the reasons that follow, the motion for summary

judgment is GRANTED IN PART and DENIED IN PART, and the motion for leave

GRANTED.

## BACKGROUND[1]

Carlson is a veteran who was discharged from the military in 2010 because he was

diagnosed with restless leg syndrome, post-traumatic stress disorder ("PTSD"),

temporomandibular joint dysfunction ("TMJ"), and an umbilical hernia.  Carlson suffers from

panic attacks.

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  The facts related here are, unless otherwise noted, taken from Sexton's statement of undisputed material facts, Br. Mot. Summ. J. 3–6, ECF No. 18; from Carlson's disputed material and immaterial facts and additional material facts, Resp. Mot. Summ. J. 3–8, 4–24, ECF No. 21; from Sexton's reply thereto, Reply Mot. Summ. J. 1–19, ECF No. 22; and from the exhibits to the motions.  Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Carlson, the non-moving party, and draws all reasonable inferences in his favor.  *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

Sexton sells new and used cars in Moline, Illinois. Carlson worked as a salesperson selling cars for Sexton from November 29, 2010 until May 20, 2011, and then again from March 30, 2013, until he was fired on October 6, 2014. When he was hired the second time, he indicated in hiring questionnaires that he did not need any kind of special accommodation to do his job. However, according to Carlson, his health problems did interfere with his job performance. He was, he says, terrified of filling balloons for dealership events because of his anxiety about the noise they might make if they popped. He would get anxious at work sometimes and need to remove himself from whatever situation was making him anxious. He would have to sit down sometimes to manage his restless leg syndrome, or stand sometimes if he had been sitting too long. The managers at Sexton, including Sales Manager Rex Pauley, Tom Lansman, Vince Pellegrini, and Gerry Swan, would let him take breaks, but only if there was someone else to man the door. Carlson avers that when someone wasn't at the door, he would sometimes take breaks anyway. Sexton doesn't dispute that any of these medical conditions exist, but asserts that neither Pauley nor any other manager was made aware of them, and that Pauley had never actively denied a request by Carlson to take a break. *See* Reply 5–6.

The parties disagree over a number of other details about Carlson's condition, and about whether Sexton and its managers were ever informed about these details. Carlson states that sometimes he would need to take days off work to go to doctors' appointments, and that if he wished to do so, he would have to find another salesperson who could cover for him. If he was unable to find someone, he says, he would have to reschedule his appointment. Carlson was permitted to take time off for at least three such appointments, but asserts without contradiction that he had several other appointments during this time period. *See* Br. Mot. Summ. J. 5, ECF No. 18; Resp. Mot. Summ. J. 7–10, ECF No. 21. In addition, Carlson says he would sometimes

experience unpleasant side effects from the medications he took for his conditions, and want to leave work, but not be permitted to. He also asserts that he had panic attacks at work. For its part, Sexton does not challenge Carlson's assertions that he suffered from these symptoms, but disputes that Pauley or anyone else in management was aware of Carlson's attempts to take time off, or that anyone knowingly prevented him from doing so.

On one occasion, Carlson experienced numbness, tingling, arm pain, and blurred vision while at work. Pauley had another employee drive Carlson to the hospital, where he was diagnosed with a panic attack, although Sexton contends that neither Pauley nor anyone else in charge at Sexton was told that this event might be a panic attack, or was informed afterward what the episode had been. Carlson claims that at least Pauley and Pellegrini were aware that he had PTSD, either through direct conversations on the topic, in the case of Pellegrini, or because of broader circumstantial evidence of his condition, in Pauley's case. Sexton denies both of those assertions, pointing to Pauley's and Pellegrini's denials in their depositions. Sexton does not dispute that Swan and Lansman were aware that Carlson frequently had appointments at a Veterans Affairs ("VA") hospital.

From January 1, 2014, through September 30, 2014, Carlson had the third lowest gross sales total of the salespeople working full time for Sexton during that period, although Carlson points out, as a reason for this, that he missed a number of days for VA appointments. Carlson also contests Sexton's observation that he was the least productive salesperson in the last two months of his employment, observing that Sexton typically measured productivity in three-month increments in order to account for unpredictability, and that by that metric, he had higher gross sales than three other salespeople. Sexton says that Pauley talked with Carlson on several

occasions in 2014 about his poor sales performance. Carlson denies that any such conversations happened, or that he was ever specifically talked to about his sales performance.

Sexton fired Carlson on October 6, 2014. Pauley stated in his deposition that he and the other managers collectively decided to fire Carlson because of his poor sales performance, and that Lansman fired Carlson by telling him: "You're not giving a hundred percent. Today is your last day." Br. Supp. Mot. Summ. J. 6.

Carlson denies this version of events. In his telling, he became aware in late September of 2014 that he would soon be getting a "disability percentage rating" from the VA.[2] When he mentioned this in a morning sales meeting, Swan overheard him and said, "Is that when you're planning on quitting? When you get that big fat check for your disability, you're going to quit, right?" Resp. Mot. Summ. J. 20. Carlson later complained to Pauley about the comment. Carlson did receive a letter, dated September 29, from the Department of Veterans Affairs rating his PTSD as 70% disabling. The Department of Veterans Affairs stated in the letter that this percentage corresponded to:

> [O]ccupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse controls (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or worklife setting); inability to establish and maintain effective relationships.

VA Letter, Resp. Mot. Summ. J. Ex. 8, ECF No. 21-3. Carlson's wife, who initially received the letter, delivered it to him at work, and he showed it to his co-workers, and to Pauley. Shortly thereafter, on October 6, Pauley told Carlson to meet him and Lansman in the dealership's

---

[2] The VA bases the rate at which it compensates people with disabilities on its assessment of how disabled a person is, expressed as a percentage. *See How VA Calculates Compensation Rates*, U.S. Dept. of Veterans Affairs, https://www.benefits.va.gov/compensation/rates-index.asp#howcalc (last visited Sept. 7, 2017).

conference room, where Lansman told Carlson: "[W]e're going to have to part ways . . . . due to you not being a hundred percent while you're here, being on the medications that you're on and missing work for appointments at the VA, we need to let you go." Carlson Dep. 110:18–23. Resp. Mot. Summ. J. Ex. 1, ECF No. 21-1. As Carlson left, Pauley told him: "You need to get your ass to the unemployment office tomorrow . . . . You did nothing wrong to get fired, and we will not fight you over that." *Id.* at 112:15–19. For its part, Sexton denies this version of the firing, except to concede the contents of the VA disability letter and the fact that Carlson was summoned before Pauley and Lansman to be fired.

Carlson filed suit on December 31, 2015. Compl., ECF No. 1. He alleged (I) interference with an FMLA entitlement pursuant to 29 U.S.C. § 2615(a)(1), Compl. 1–4; (II) discrimination and retaliation for exercising his rights under the FMLA pursuant to 29 U.S.C. § 2615(a), Compl. 4–5; (III) an adverse treatment claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, Compl. 5–8, as well as a claim that Sexton failed to accommodate his disability reasonably; and (IV) a claim for disability discrimination under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101–5/10-104, Compl. 8–11. The motion for summary judgment followed on December 20, 2016.

## DISCUSSION

### I.     Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its

favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## II. Analysis

Sexton argues that both of Carlson's FMLA claims must be dismissed because Carlson cannot show that he had a serious health condition within the meaning of the FMLA, Br. Mot. Summ. J. 8–9; that his FMLA interference claim must fail because he did not provide notice to his employer of his need for FMLA leave, *id.* at 10–11; that this claim must also fail because he was not denied an FMLA benefit, *id.* at 11–12; that his FMLA discrimination and retaliation claim must fail because he has not shown that he engaged in a protected activity, *id.* at 13–14; and that he cannot establish a causal connection between an FMLA-protected activity and his firing to support the same claim, *id.* at 14–16. Sexton argues that Carlson's ADA claim must be dismissed because he is not a qualifying person with a disability within the meaning of the ADA, *id.* at 16–17; he cannot show that Sexton was aware that he had a qualifying disability, *id.* at 17–18; he cannot show he was terminated because of his disability, *id.* at 18–21; and he cannot show that he notified Sexton of his disability sufficiently to support a failure to accommodate claim, *id.* at 21–22. Sexton argues that Carlson's IHRA claim fails for the same reasons his ADA claim fails, *id.* at 22–23.

### a. FMLA Claims

The FMLA entitles an eligible employee to 12 workweeks of leave during a 12-month period for a number of reasons, including "a serious health condition that makes [her] unable to perform the functions of [her] position[.]" 29 U.S.C. § 2612(a)(1)(D). It also entitles an employee to be reinstated to the same or a similar position upon return from FMLA leave. *Id.* § 2612(b)(2). It is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" this right. *Id.* § 2615(a)(1). It is similarly illegal for an employer to retaliate or discriminate against an employee for opposing any practice made unlawful by the FMLA. *Id.* § 2615(a)(2). Thus, the FMLA creates separate causes of action for interference with an entitlement and for retaliation for opposing practices made illegal by the act, *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 992 (7th Cir. 2010), although, as discussed in subsection 3 below, the statutory sources and elemental differences between the two are far from clear.

### 1. Serious Health Condition

In order to be eligible for FMLA leave under 29 U.S.C. § 2612(a)(1)(D), an employee must have a serious health condition. Sexton contends that Carlson cannot show he had such a condition because he has provided no evidence that he required inpatient care for his ailments or needed continuing care for a condition that had initially involved more than three consecutive days of inability to work. Br. Supp. Mot. Summ. J. 8–9; *see* 29 U.S.C. § 2611(11) (defining serious health condition as "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care . . . or . . . continuing treatment by a health care provider").

However, as Carlson observes, Sexton misconstrues regulatory guidance defining one kind of "continuing treatment" as a requirement for all kinds of "continuing treatment." 29 C.F.R. § 825.115 states that a serious health condition involving continuing treatment by a health care provider includes one or more of five different circumstances: "a period of

incapacity of more than three consecutive, full calendar days," *id.* § 825.115(a); "[a]ny period of incapacity due to pregnancy," *id.* § 825.115(b); "[a]ny period of incapacity or treatment for . . . incapacity due to a chronic serious health condition," *id.* § 825.115(c); a period of incapacity resulting from a long-term condition for which treatment may be ineffective, *id.* § 825.115(d); or a period of absence resulting from multiple treatments, *id.* § 825.115(e). Since any one of the five listed conditions is sufficient to qualify as a serious health condition involving treatment by a health care provider, no single condition is necessary. *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 310 (7th Cir. 2006), upon which Sexton relies, is not to the contrary. *See id.* (stating that an older version of the regulations provided that a three-day period of incapacity satisfied the requirement).

As Carlson makes clear, he relies not on subsection (a), which requires a period of incapacity for three consecutive days, but on subsection (c), which requires a chronic condition, and makes no mention of three consecutive days of incapacity. The regulations define a chronic condition as one that:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c). Carlson's uncontradicted account of his PTSD fits this description well. He made several visits to the VA for treatment of his PTSD, which did not abate and required treatment during the entire time relevant to this lawsuit, and was at least sometimes episodic in nature (panic attacks). *See Lee v. City of Elkhart, Ind.*, 602 F. App'x 335, 339 (7th Cir. 2015)

("PTSD . . . can be a 'serious health condition' qualifying a person for FMLA leave . . . ."). A jury could find that Carlson's PTSD or his other ailments were serious health conditions under 29 U.S.C. § 2612(a)(1)(D).

### 2. FMLA Notice

To succeed on an FMLA interference claim, an employee must establish that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). Sexton contends that Carson hasn't provided evidence sufficient to survive summary judgment against his interference claim on either the fourth element (notice), or the fifth (denial of a benefit).

"The employee's notice obligation is satisfied so long as he provides information sufficient to show that he *likely* has an FMLA-qualifying condition." *Id.* at 479. "An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice[.]" 29 C.F.R. § 825.301(b). Indeed, the employee can be completely ignorant of his FMLA rights so long as he provides sufficient notice of his condition. *Stoops v. One Call Commc'ns.*, 141 F.3d 309, 312 (7th Cir. 1998). Because notice need not be explicit, "notice inquiry is a 'fact-rich question . . . perhaps best resolved by the trier of fact, particularly, where . . . the employer and employee dispute the quantity and nature of communications regarding the employee's illness.'" *Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012) (first ellipsis in original) (quoting *Pagel v. TIN Inc.*, 832 F. Supp. 2d 965, 972 (C.D. Ill. 2011)). As explained above, Carlson's PTSD, and potentially his other ailments, could be found by a jury to be FMLA-qualifying conditions, so the

notice question is whether Carlson provided Sexton information sufficient to show that he likely had such conditions.

Sexton argues that Carlson "never informed [it] of a probable need for medical leave." Br. Supp. Mot. Summ. J. 10. However, there are many facts in the record suggesting that Carlson communicated to his employer facts about his PTSD, its effect on him, and his resultant need for time off. Carlson testified that there were times when the medications he had been prescribed for his conditions affected him when he came in to work, his managers noticed, and they sent him home because of it. *Id.* at 73:17–20. Carlson also testified that sometimes, he would want to leave under these circumstances, but his managers would make him stay. *See id.* at 74:3–5 ("There [were] a couple of times where they made me stay there until I tried to feel like I was back to normal."). Most significantly, Carlson testified that he explicitly told Pellegrini about his PTSD. *Id.* at 164:7–13 ("But then I brought up PTSD. That's about one of the worst things to have. And so we were talking about that, and he just kept on saying over and over, yeah, I cannot imagine going through what you guys go through, like to have something trigger you, you know, just out of the blue and stuff like that."). He also stated that he and Pauley, who was also a veteran with PTSD, had talked about having the same doctor at the Bettendorf, Iowa VA clinic, the pills Carlson had to take, and the timing of Carlson's VA appointments. Carlson Interrog. 2, Resp. Mot. Summ. J. Ex. 5, ECF No. 21-2; *see Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012) ("Under Federal Rule of Civil Procedure 56(c), a district court 'may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of those interrogatories would be admissible at trial.'" (quoting *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008))). Finally, Carlson said that

he had shown Pauley the letter from the Department of Veterans Affairs stating that he was 70% disabled because of his PTSD.  Carlson Interrog. 2.

Sexton disputes many of these claims, in general and in detail, but summary judgment is not the place to resolve such disputes.  A reasonable jury could conclude that Sexton received notice of Carlson's PTSD sufficient to show that he likely had an FMLA-qualifying condition.

### 3.  Denial of an FMLA Benefit

Sexton claims that Carlson cannot make out the fifth element of an FMLA claim because he cannot show that he was denied FMLA benefits to which he was entitled.  Br. Supp. Mot. Summ. J. 11–12.  Sexton seems to believe that Carlson can only argue, in bringing an FMLA interference claim, that he was prevented from taking time off that he requested, or prevented from returning to work after a period of absence.  *See id.*  However, the interference prohibited by the FMLA is broader than this, and includes termination of an employee because he has elected to exercise his rights under the FMLA by taking leave, or refusal to allow an employee to return to the same or a similar position after taking leave.  The FMLA's implementing regulations explain:  "The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c).

Sexton's confusion may come from the fact that three pertinent subsections of the FMLA describe prohibited conduct by employers—2615(a)(1), (a)(2), and (b)—but the various courts of appeal, including the Seventh, have not clearly explained the nature of and differences between the causes of action these provisions give rise to.  29 U.S.C. § 2615 reads, in whole:

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

(b) Interference with proceedings or inquiries

It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual--

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

The most recent canonical gloss on this language in the Seventh Circuit suggests that the statutory text gives rise, in the wrongful termination context, to two causes of action, distinguished by an employer's level of discriminatory intent. "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). [3] "Interference with rights," as that term is used in subsection (a),

---

[3] *Kauffman* presented an unusually clear example of how interference with an FMLA entitlement can verge into termination. Kauffman, a FedEx employee, had incurred two "strikes" under a FedEx employment policy, and then took leave. 426 F.3d at 882. He was later fired for not having properly authorized the leave and thus for having received a third "strike," after having been prompted by his supervisor to submit the proper forms to have the leave authorized as FMLA-qualifying. *Id.* The *Kauffman* court "clarif[ied] that Kauffman's case is really about

appears to include conduct sweeping from denial of a requested leave to termination of an employee who has taken too much leave, perhaps via the expedient of denying a requested return to work; this far end of the spectrum is a claim for wrongful termination on an "interference/entitlement" theory. Add some quantum of retaliatory animus, and it becomes a "discrimination/retaliation" theory. Both such claims, however, would seem to have to be brought under § 2615(a)(1), since (a)(2) and (b) ban only adverse employment action on the basis of "opposing any practice" made illegal by the FMLA, or participating in other FMLA-related proceedings.

But on other occasions, the Seventh has suggested that termination for taking or seeking to take FMLA leave is always a "retaliation" claim, whose elements are similar or identical to an ADA claim for retaliation, and arise from § 2615(a)(2) and (b). *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503–04, 509 (7th Cir. 2004) (interpreting plaintiff's FMLA claim for termination as depending on whether firing was retaliation for announcing that plaintiff had AIDS, and by implication, would be exercising FMLA rights). And on still other occasions, the court has suggested subsection (a)(1) creates a cause of action for interference which is separate from any claim for retaliation, which latter claim is created by subsections (a)(2) and (b). *See Goelzer*, 604 F.3d at 992. The point of deepest confusion seems to lie in the fact that subsection (a)(1) bans interference with exercise of FMLA *rights*, i.e. leavetaking or reinstatement, but also seems to be the only place to fit retaliation based simply on taking FMLA leave, since subsection (a)(2), although labeled "discrimination," bars discrimination only for "opposing any practice made

---

interference with his substantive rights, not discrimination or retaliation," *id.* at 884, reasoning that Kauffman alleged not that he'd been fired for exercising his rights under the FMLA, but rather that he'd engaged in a protected activity and been fired nonetheless, with the offered reasons being the activity (taking time off). *See id.* at 885 ("Viewing the record in the light most favorable to Kauffman, the nonmoving party, FedEx managers wanted to get rid of him because they thought he was argumentative and a troublemaker, so they pounced on a chance to fire him. But they did so in spite of his rights under the FMLA, not because he asserted those rights.").

unlawful by this subchapter." Courts have not always seemed to know where a claim calling itself "retaliation" should fit.

District courts have attempted to pick their way through this hazard-strewn landscape, most commonly by just asserting that their facts marry up with those of a prior Seventh Circuit case, and analysis to dispositive effect is therefore unnecessary. *See Travis v. City of Madison*, No. 14-CV-199-WMC, 2015 WL 2092681, at *14 (W.D. Wis. May 6, 2015) ("This is nearly identical to the claim in *Kauffman*, which the Seventh Circuit concluded was properly characterized as an interference claim. Said another way, it presents a question of whether Travis was entitled to leave and, if so, whether the City respected that entitlement."). Out-of-circuit precedent is no less murky. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1122–25 (9th Cir. 2001), for example, holds, with lengthy reliance on the FMLA's similarity to the National Labor Relations Act, that subsection (a)(1) governs all terminations of employees who take FMLA leave, including retaliatory ones, despite the fact that the language of discrimination and retaliation is wholly confined to subsections (a)(2) and (b).[4] *See id.* at 1124–25 ("By their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave.").

These muddy distinctions could remain safely academic were it not for the fact that Carlson claims to have brought two separate claims under the FMLA, and Sexton to have attacked their sufficiency on distinct grounds. However, enough is clear to deny Sexton's request for summary judgment on Carlson's first count for at least two reasons.

---

[4] This requires the *Bachelder* court to deplore, albeit mildly, the insouciant regulatory conflation of interference and discrimination in 29 C.F.R. § 825.220(c), cited above. "As noted, the particular provision of the regulations prohibiting the use of FMLA-protected leave as a negative factor in employment decisions, 29 C.F.R. 825.220(c), refers to 'discrimination,' but actually pertains to the 'interference with the exercise of rights' section of the statute, § 2615(a)(1), not the anti-retaliation or anti-discrimination sections, §§ 2615(a)(2) and (b). While the unfortunate intermixing of the two different statutory concepts is confusing, there is no doubt that 29 C.F.R. 825.220(c) serves, at least in part, to implement the interference with the exercise of rights section of the statute." 259 F.3d at 1124–25.

Carlson calls his first claim "Interference with FMLA Entitlement," Compl. 1, and seeks relief under 29 U.S.C. § 2615(a)(1). Compl. 3. He cites as an example of this interference a failure to reinstate him, by which he presumably means firing him, since no one has claimed he took a period of FMLA leave and then was not permitted to return. *Id.* But he has also produced enough evidence at summary judgment to permit a reasonable jury to find that he was terminated because he took time off, and despite his right to do so under the FMLA—which is enough to support a claim for interference with an entitlement under 29 U.S.C. § 2615(a)(1). If indeed Carlson was fired for "missing work for appointments at the VA," Carlson Dep. 110:22–23, and that activity was protected by the FMLA, then Sexton interfered with his exercise of rights under the FMLA by firing him for it. *See Kauffman*, 426 F.3d at 884. In addition to his firing, Carlson adduces many other more procedural failures to comply with the FMLA on Sexton's part (mostly, failures of notice about FMLA rights). *See* Resp. Mot. Summ. J. 40. And he testified that on many occasions, he was prevented from taking leave when he asked for it. Both showings are also sufficient to survive summary judgment on an interference theory.

Carlson has made a showing sufficient to survive summary judgment on his interference claim under 29 U.S.C § 2615(a)(1) by alleging interference with the exercise of FMLA-protected rights.

### FMLA Protected Activity

The confusion surrounding different sorts of FMLA claims comes more clearly into view in Sexton's attack on Carlson's second FMLA count, labeled "FMLA Discrimination and Retaliation," Compl. 4, and claimed to be brought under 29 U.S.C. § 2615(a), without specifying a subsection. Sexton argues that he "cannot establish that he engaged in a protected activity." Br. Supp. Mot. Summ. J. 13. By this, Sexton appears to mean that Carlson cannot show on the

basis of competent evidence that he sought to take FMLA leave which he was denied. *See id.* ("Carlson never indicated to Sexton Ford that he needed leave beyond that which he requested and was granted."). Carlson responds with arguments identical to those he made as to notice of an FMLA-qualifying condition, addressed above. As the Court has already explained, Carlson did provide such notice.

But Sexton's core contention is that, as to Count II of the Complaint, Carlson hasn't alleged that he engaged in "protected activity," a term Sexton draws from *Goelzer*. *See Goelzer*, 604 F.3d at 995 ("To succeed on a retaliation claim, the plaintiff does not need to prove that 'retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by "showing that the protected conduct was a substantial or motivating factor in the employer's decision."'" (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008))). *Goelzer* does state that "protected conduct" must have been a substantial factor in a defendant's decision to terminate a plaintiff, but *Goelzer* does so in order to define the causation requirement for a 29 U.S.C. § 2615(a)(2) claim for discrimination based on opposing an FMLA-prohibited practice, which *Goelzer* terms a retaliation claim.[5] Sexton has pointed out, in a roundabout way, that Carlson never opposed a practice prohibited by the FMLA. It is unclear whether Carlson meant to bring a claim under § 2615(a)(2), alleging termination for "opposing any practice" made unlawful by the FMLA; or, rather, whether Count II is a "retaliation" claim merely in the sense that Carlson means he was terminated in retaliation for taking FMLA leave. *See Kauffman*, 426 F.3d at 884 ("A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory[.]"). In any event, it is plain enough from Carlson's Response, Resp. Mot. Summ. J. 42–43, which addresses only whether Carlson

---

[5] *Goelzer* then cites *Kauffman*'s distinction between interference-termination and termination with added animus, and discusses a termination based entirely on using FMLA leave, rather than opposing a practice made unlawful by the FMLA. 604 F.3d 995–96.

adequately notified Sexton of his qualifying condition, that Carlson does not now seek to show that he opposed any practice made unlawful by the FMLA. Rather, he and Sexton seem both to assume that he seeks only to show that he took FMLA leave and was fired for it, not that he opposed a practice made unlawful by the FMLA.

Therefore, Carlson's Count II is dismissed insofar as it relies upon 29 U.S.C. § 2615(a)(2), which plainly requires a showing that he opposed a practice made unlawful by the FMLA. Insofar as he is alleging that he was retaliated against for taking FMLA leave, however, he has offered enough evidence for his claim to survive, as discussed above.

### 4. Causal Connection Between Protected Activity and Firing

Carlson will have to show at trial that he was terminated for exercising his right to leave under the FMLA. *Goelzer*, 604 F.3d at 995. As with an ADA claim, the question at summary judgment is just "whether the evidence would permit a reasonable factfinder to conclude that the . . . proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Plaintiffs may also survive a motion for summary judgment via the so-called "burden shifting" method outlined first in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). However, after evincing lengthy confusion about how to proceed after *Ortiz*, Resp. Mot. Summ. J., 43–45, Carlson indicates that he will do so by pointing to evidence that he was fired because of his FMLA leave usage. This is the ordinary, so-called "direct," non-burden shifting method.

In support of a causal connection between his exercise of FMLA rights and his firing, Carlson notes that, in his version of events, Lansman told him he was being fired because he had missed work to go to appointments at the VA. *Id.* at 45. He also notes that the timing of his termination was suspicious, coming shortly after he had taken time off to go to VA

appointments, and days after he had received his letter confirming benefits and rating him as 70% disabled. *Id.* He also notes that Sexton's offered reason for firing him is weak. All three arguments are strong.

In Carlson's version of his firing, Lansman told him "Well, due to you not being a hundred percent while you're here, being on the medications that you're on and missing work for appointments at the VA, we need to let you go." Lansman's alleged statements constitute a compact FMLA cause of action all by themselves. Lansman, a manager, is alleged to have evinced knowledge that Carlson, an employee, was taking time off for the purpose of going to the VA hospital as a result of an FMLA-qualifying condition. Lansman is alleged to have directly cited this protected activity as a reason for Carlson's termination. While this version of events is of course disputed, if a jury believed Carlson, they would be compelled to find in his favor on the FMLA discrimination claim. Summary judgment is therefore not appropriate.

Although Carlson's account of Lansman's statement is sufficient on its own to survive summary judgment, the Court notes that the other evidence he offers also militates against summary judgment. Carlson had taken time off on at least three occasions, and maybe more often, as a result of his medical condition. According to his version of the facts, he had just received confirmation from the VA that he was 70% disabled, and had told management about that. It would be reasonable for his managers to infer from these circumstances that Carlson was likely to take FMLA-protected time off in the future, and perhaps more of it, since he had just received official confirmation from a government agency that his condition was extensive and debilitating. He was fired just a few days after he received the letter. These facts support an inference that a factor in his firing was retaliatory animus, or at least the prospect of his likely future requests for time off under the FMLA. "In the context of a retaliation claim,

'circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination.'" *Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d 904, 913 (N.D. Ill. 2015) (quoting *Pagel*, 695 F.3d at 631). This timing is highly suspicious, and supports the retaliation claim strongly.

Finally, although Sexton's evidence that Carlson's sales numbers were low is not facially suspicious or obviously pretextual, it also lacks key supporting facts that would be needed to make it convincing. Sexton points out that Carlson sold only seven and a half cars in his last two months at the dealership, the lowest number of any employee, and his total sales numbers from the beginning of the year onward were the third lowest of salespeople. *See* Br. Supp. Mot. Summ. J. 5. But, as Carlson observes, his sales numbers were not the lowest for the last three months of his employment, which, he asserts uncontestedly, was the standard measure of sales performance at Sexton. Resp. Mot. Summ. J. 46. Rather, he was the fourth lowest. *See* Sexton Sales Figures 2014, Br. Supp. Mot. Summ. J. Ex. E, ECF No. 18-5. More troublingly, the data Sexton presents seems insufficient to support the unargued conclusion that Carlson's sales numbers were unusually bad, or not in line with Sexton's legitimate expectations. The sales figures that Sexton offers show that Sexton seems to have employed only 14 to 16 salespeople during the relevant period. It also reveals a high variability in monthly sales figures. And Sexton does not provide the comparable sales averages for its higher-selling salespeople. In other words, Sexton does not show why sales numbers at the bottom of a small sample range for only two measuring periods, not measured against an average sales amount or other statistical measure of typical performance, suggest that there was anything deficient about Carlson's individual sales numbers. Add to this the fact that Carlson disputes ever having been spoken to

by a manager about his low sales numbers, and Sexton's offered reason for terminating Carlson does little or nothing to diminish the inference that he was fired because of his exercise of FMLA rights.

Carlson has made a showing of causation sufficient to survive summary judgment on his FMLA claim.

### b. ADA Claims

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This is commonly termed a disparate treatment claim. An employer must also make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" *Id.* § 12112(b)(5)(A). Like the FMLA, the ADA also prohibits employers from retaliating against an individual for opposing an act or practice made unlawful by the ADA. *Id.* § 12203(a). While Carlson pleaded his ADA claim in a single count, he appears to assert his former employer's liability on both disparate treatment and failure to accommodate theories.

### 1. Qualified Individual With a Disability

In order to succeed on either disparate treatment or failure to accommodate claims, a plaintiff must make out a prima facie case that he is a qualified individual with a disability within the meaning of the ADA. *Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir. 1997). The ADA defines a qualified individual as one who "with or without reasonable accommodation, can

perform the essential functions of the employment position that such individual holds or desires."
42 U.S.C. § 12111(8).  A "disability," in the technical sense employed by the statute, is "a
physical or mental impairment that substantially limits one or more major life activities," *id.*
§ 12102(1)(A); "a record of such an impairment," *id.* § 12102(1)(B); or "being regarded as
having such an impairment," *id.* § 12102(1)(C).  "Major life activities," in turn, are
nonexhaustively defined as "caring for oneself, performing manual tasks, seeing, hearing, eating,
sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading,
concentrating, thinking, communicating, and working."  *Id.* § 12102(2)(A).  Major life activities
also include major bodily functions, including brain function.  *Id.* § 12102(2)(B).  EEOC
regulations add "communicating [and] interacting with others" to the list of major life activities.
29 C.F.R. § 1630.2(i)(1)(i).

Sexton argues that Carlson has "failed to generate a fact issue" as to whether he is
disabled, Br. Supp. Mot. Summ. J. 17, but the argument is conclusory, and its factual support
limited to opining that courts have taken a narrow view of what constitutes a limitation on
working as a major life activity.  Such an argument ignores the EEOC's regulatory guidance,
under the heading "Predictable assessments," 29 C.F.R. § 1630.2(j)(3), that "it should easily be
concluded that . . . post-traumatic stress disorder, obsessive compulsive disorder, and
schizophrenia substantially limit [the major life activity of] brain function."  *Id.*
§ 1630.2(j)(3)(iii).  Carlson was uncontestedly diagnosed with PTSD, for which he uncontestedly
receives continuing medical treatment, and which uncontestedly causes him an array of
symptoms.  These symptoms, according to Carlson, included anxiety, for which he was, again
uncontestedly, once taken to the hospital while at work.  Carlson testified that he had panic
attacks at work which required him to stop standing by the front door to greet customers; he also

testified that the medications he took for it sometimes made him unable to work, and that he suffered from generalized, pervasive anxiety surrounding tasks as basic as inflating balloons in front of the dealership. It is difficult to see how Sexton supposes this condition, which it agrees Carlson has, does not affect his ability to work, or many of the other statutorily enumerated activities like reading, concentrating, communicating, and thinking. The Court cannot see, anyway. Carlson's PTSD and associated symptoms very obviously constitute conditions that a reasonable jury could find to be disabling within the meaning of the ADA. This Court is not alone in following regulatory guidance to find as much. *See, e.g.*, *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp. 3d 940, 951 (N.D. Ind. 2016) ("This conclusion is supported by the regulation providing post-traumatic stress disorder should virtually always be found to impose a substantial limitation on a major life activity[.]"); *see also* 29 C.F.R. § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.").

### 2. Sexton's Knowledge of Carlson's Disability

"[A]n employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). Sexton concedes that Carlson has alleged he "discussed his symptoms and impairments with Sexton Ford representatives," Br. Supp. Mot. Summ. J. 18, but asserts, without further argument, that Carlson has not shown sufficiently that he made his employers known that these symptoms impaired a major life activity; i.e., were ADA-qualifying.

However, *Hedberg* held that an employer who merely has notice of some of an employee's symptoms, but not of an employee's actual illness, is not necessarily liable under the ADA for firing him because of those symptoms.  This is so because there are many reasons not rooted in illness that an employee might fail to meet an employer's legitimate expectations, and thus many reasons that an employer might fire an employee that were not discriminatory as to the illness—even if that employee were actually ill and the deficiencies actually symptoms.

> The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior. The ADA does not require clairvoyance.

47 F.3d at 934.  However, the court went on to say, "[o]f course, if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer." *Id.*  *Hedberg* stands for the proposition that an employer may know about some of a sick person's symptoms, but not the name of the sickness, and thus fire them for (legally) innocent reasons under the ADA.  It does not stand for the proposition that an employer may know about a sick person's sickness but be insufficiently informed about all of the sickness's particular symptoms.  This is plain from the simple statutory requirement that a person may be a qualified individual with a disability even if he is not actually ill, but is nonetheless "regarded as having such an impairment," 42 U.S.C. § 12102(1)(C), by his employer.  Under such circumstances, by hypothesis, there are not (necessarily) any symptoms for an employer to be aware of, just the illness upon whose basis the employer takes an adverse employment action.  It is also plain from the lack of any statutory or regulatory guidance, or any case law cited by Sexton, as to how much *beyond* the name of a particular illness or impairment an employer would have to be shown to have known for liability to accrue.

In this case, Carlson states that he discussed his PTSD with both Pellegrini and Pauley. A jury could find that Sexton knew Carlson suffered from PTSD. Nothing more is required as to Sexton's awareness of Carlson's condition, if it fired him for having PTSD.

### 3. Causal Connection Between Disability and Firing

As with an FMLA claim, an ADA plaintiff must show at summary judgment that a reasonable jury could find that "(1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified to perform the essential functions of the job with or without accommodation; and (3) that the plaintiff has suffered an adverse employment action because of his disability." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). And also as with the FMLA, a plaintiff may proceed via the *McDonnell Douglas* burden shifting approach. *Id.* at 685. Again, though, Carlson proceeds only via the direct method. *Resp. Mot. Summ. J.* 52–53.

A word of warning: Sexton tries to argue that Carlson can't "set forth a 'convincing mosaic' of circumstantial evidence under the direct proof method." Br. Supp. Mot. Summ. J. 20. The Seventh Circuit has cautioned that "any decision of a district court that treats this phrase ["convincing mosaic"] as a legal requirement in an employment-discrimination case is subject to summary reversal, so that the district court can evaluate the evidence under the correct standard." *Ortiz*, 834 F.3d at 765. Carlson does not have to "set forth" any kind of mosaic, convincing or otherwise, and a finding by this Court that he had done so would be subject to summary reversal.

Carlson's most significant evidence that he was fired because of his PTSD is Lansman's statement at the time of firing. Sexton claims that Carlson's version of these events is ambiguous, and that, because the statement "fall[s] short of an outright admission that Carlson's termination was due to his disability," Carlson has not sufficiently shown that his termination

was because of his disability.  Br. Supp. Mot. Summ. J. 20.  But, even to the extent that Lansman's alleged statement is ambiguous, when construed in the light most favorable to Carlson, it is enough on its own to survive summary judgment.  "Well, due to you not being a hundred percent while you're here, being on the medications that you're on and missing work for appointments at the VA, we need to let you go."  A reasonable jury could construe the claim about Carlson "not being a hundred percent" as a reference to his PTSD and its effect on him, or one of his other ailments.  Carlson testified that he had to go home in the morning more than once as a result of the medications he was taking.  A reasonable jury could therefore also construe Lansman's alleged statement about firing him because of the medications he was on as an admission that Carlson was fired because of the illnesses those drugs treated.  Finally, as the Court has already noted with respect to Carlson's FMLA claims, even if a jury did not accept Carlson's version of Lansman's statement, it could construe as discriminatory Sexton's decision to fire him days after he received a detailed diagnosis, in letter form, of his PTSD—a diagnosis that he had showed to Pauley, again just days earlier.

Sexton has produced competent evidence from which a jury could infer that he was fired because of an ADA-qualifying disability.

### 4.  Failure to Accommodate

"In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability."  *Bunn*, 753 F.3d at 682 (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).  Reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an

individual with a disability who is qualified to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(1)(ii). While "it may be necessary for [an employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation" in order to determine whether his disability can be accommodated, *id.* § 1630.2(o)(3), "there is no separate cause of action for a failure of that interactive process." *Bunn*, 753 F.3d at 683.

Viewing the evidence in the light most favorable to Carlson, a reasonable jury could conclude that Sexton knew of Carlson's PTSD and other conditions and thus was under an obligation to engage in an interactive process with him. *See Sears*, 417 F.3d at 804. A jury could further conclude that Sexton's behavior—in Carlson's version, allowing him a few days off here and there but denying him others, requiring him to stand at the door even when he felt physically unable to, and requiring him to reschedule his VA appointments, then firing him— amounted to a failure to engage in an interactive process, and thus, a failure to reasonably accommodate his disabilities. Although Sexton points out that Carlson did not formally request a reasonable accommodation, he was not required to do so in order to inform Sexton of his condition. *See id.* ("Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification, In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." (citation omitted)).

### c. IHRA Claim

Sexton asks that Carlson's IHRA claim be dismissed for the same reasons it asks that his ADA claims be dismissed. Br. Supp. Mot. Summ. J. 23; *see Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 958 (N.D. Ill. 2016) ("[C]ourts analyze IHRA disability claims for discriminatory

intent the same way that they analyze ADA claims.").  For the same reasons that the Court denies the motion for summary judgment as to Carlson's ADA claim, it is denied as to his IHRA claim.

### d.  Summary of Holding

In summary, all of Carlson's claims survive summary judgment, except Count II.  Count II is dismissed only insofar as it relies on 29 U.S.C. § 2615(a)(2).

## CONCLUSION

Accordingly, Defendant's motion for summary judgment, ECF No. 17, is GRANTED IN PART AND DENIED IN PART, and Plaintiff's motion to file an overlength response, ECF No. 20, GRANTED.  The final pretrial order deadline, final pretrial conference, and jury trial dates, which were previously vacated, are reset as follows:  the proposed final pretrial order is due by November 21, 2017; the final pretrial conference is set for 10:00 a.m. on November 28, 2017 at the Rock Island courtroom, with attorneys who will actually try the case to be present; and the jury trial is set for January 29, 2018 at 9:00 a.m., also at the Rock Island courtroom.  The proposed final pretrial order shall comply with the requirements set forth in Local Rule 16.1(F).


Entered this 26th day of September, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE